IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ERNEST CRUMP, JR.        ) | |
| )| |
| Plaintiff,        ) | |
| ) | |
| v.        ) | C.A. No. 04-329-SLR |
| ) | |
| ROBERT MAY, THOMAS RYGIL,        ) | |
| VINCE BIANCA, and STAN TAYLOR,        ) | |
| ) | |
| Defendants.        ) | |

## STATE DEFENDANTS' MEMORANDUM OF LAW

**A.    STATEMENT OF FACTS**

1.    Plaintiff is a prisoner in the custody of the Department of Correction, currently incarcerated at Delaware Correctional Center ("DCC"), Smyrna, Delaware. On May 21, 2004, he filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants violated his First Amendment Right to the free exercise his religion. (Complaint, D.I.2).

2.    Plaintiff seeks redress as he claims that Prison officials, specifically Stan Taylor, the Commissioner of Correction, Vince Bianca, the Warden at the Morris Community Correction Center, Robert May, Staff Lieutenant, and Thomas Rygil, Corporal prohibited the free exercise of his religion by "neglecting to send me my Holy Quran and Kufi along with me to DCC. . . ." Id.

3.    The events unfold beginning on August 29, 2002, when Plaintiff escaped from the Morris Community Corrections/ Kent Work Release Center.[1]  Plaintiff escaped the facility by leaving the grounds without permission. See Affidavit of Robert May attached hereto as Exhibit "A". The Morris Community Corrections Escape Apprehension Team ("EA-Team") located Plaintiff in Dover at approximately 10:20 p.m.

---

[1] On February 6, 2003, Ernest A. Crump, Jr. pled guilty to the charge of escape after conviction based on his August 29, 2002 escape from the MCCC.

on that same evening. Thereafter, the EA-team returned Plaintiff to the MCCC/KWRC. In accordance with department procedure, following Plaintiff's escape, an administrative warrant was executed. Exhibit A. Plaintiff was transferred to a higher security level at the Delaware Correctional Center ("DCC") pending further proceedings.

**B.    STANDARD OF REVIEW**

In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b) (6), all factual allegations of the Complaint must be accepted as true, and the allegations must be construed in favor of the non-moving party. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

**C.    PLAINTIFF FAILED TO EXHAUST ADMINISTRATIVE REMEDIES PURSUANT TO 42 U.S.C. §1997e.**

4.    Defendants contend that dismissal of Plaintiff's claims is appropriate because he has failed to exhaust his administrative remedies. Prisoners are required to exhaust all administrative remedies before initiating a lawsuit pursuant to 42 U.S.C. § 1983. *See* Prison Litigation Reform Act (PLRA), 42 U.S.C. Section 1997e.  Indeed, this action is subject to the exhaustion requirements set forth in §1997e (a) which states in pertinent part:

> No action will be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

*See also, Booth v. Churner*, 206 F.3d 289, 300 (3d Cir. 2000); *Ahmed v. Sromovski*, 103 F. Supp. 2d 838, 843 (E.D. Pa. 2000) (quoting *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000)).

5.      The PLRA § 1997e exhaustion requirements are twofold. First, a prisoner complaint must pertain to conditions of his or her confinement. The Third Circuit Court of Appeals, interpreting prison conditions as defined in 18 U.S.C. § 3626(g) (2), refers "to the environment in which prisoners live, the physical conditions of that environment, and the nature of the services provided therein." *Booth*, 206 F.3d at 294. Plaintiff has been incarcerated at the Delaware Correctional Center since the conditions complained of arose.

6.      Secondly, prison officials must establish an administrative procedure to remedy prisoner complaints. The Third Circuit stated in *Jenkins v. Morton,* "[E]xhaustion promotes judicial efficiency in at least two ways. When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided. And, even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." 148 F.3d 257, 259 (3d Cir. 1998) (quoting *McCarthy v. Madigan,* 503 U.S. 140, 146 (1992).

7.      The State of Delaware Bureau of Prisons has established an Inmate Grievance Procedure whereby "every inmate will be provided a timely, effective means of having

issues brought to the attention of those who can offer administrative remedies before court petitions can be filed." See State of Delaware Bureau of Prisons Procedure Manual, Procedure Number 4.4, Section II (revised May 15, 1998) attached hereto as Exhibit "B". The procedure establishes a three-step grievance process with two levels of appeal. Id. at § V. In order to exhaust all available administrative remedies, a prisoner must complete all stages of review and participate in the appeals process. Therefore the provisions of § 1997 (e) are applicable to him.

8.  The DCC maintains an inmate grievance process which permits prisoners to seek review of the problems they experience during their incarcerated time. This process is designed to provide review and resolution of prisoner grievances. The inmate grievance procedures are made available to every prisoner in the Departments custody. The inmates are required to file formal grievances and appeals to the Inmate Grievance Chair ("IGC") in addition to informal grievances in order to fully exhaust their administrative remedies.[2] After a written grievance is submitted to the IGC,[3] investigation into the matter will be initiated and informal resolution attempted. If informal resolution is unsuccessful, the inmate grievance resolution committee ("RGC")[4] will convene and a hearing will be held, culminating in a recommendation which is forwarded to the Warden or his designee ("Warden"). If the Warden and the grievant concur with the RGC recommendation, the

---

[2] "All inmates, regardless of physical condition/security status/administrative status, shall be entitled to use the IGP." BOP 4.4 Section V.

[3] The grievance process begins when an inmate files a Form #584 which must be completed within 7 calendar days following the incident and forwarded to the IGC.

[4] The RGC is a committee comprised of institutional security staff, treatment staff, and inmate representatives that hears inmate grievances and makes a recommendation to the Warden/Warden's designee.

IGC closes the file and monitors issues of compliance. If the parties do not concur, the matter is referred to the Bureau Grievance Officer ("BGO"), who reviews the file. If the BGO concurs with the Warden's decision and the Bureau Chief of Prisons accepts the BGO recommendation, the IGC closes the file and monitors compliance. Alternatively, the BGO can attempt mediation between the grievant and the Warden or recommend outside review of the matter. See Exhibit "B".

9.  The BOP procedure for inmate grievances also provides for an emergency grievance. An emergency grievance is defined as "an issue that concerns matters which under regular time limits would subject the inmate to a substantial risk of personal, physical or psychological harm." Id. at § IV. Such emergency grievances are expedited. Its procedure provides in relevant part:

> Issues that concern substantial risk of personal, physical or psychological inmate injury shall be addressed immediately by the Warden/Warden's Designee. A copy of the grievance shall be sent to the Inmate Grievance Chair upon receipt by the Warden/Warden's Designee. And the Warden/Warden's Designee shall respond within one calendar day. Grievant appeals of the Warden/Warden's Designee's decision will be decided by the Bureau Chief of Prisons within one calendar day upon receipt of the emergency appeal. NOTE: If the Warden/Warden's Designee should determine that the grievance does not meet the emergency criteria, the grievance shall be returned to the inmate for processing through the normal IGP process steps.

Id. at section V.

10. Although Plaintiff affirms that DCC has an inmate grievance procedure, he clearly denies ever presenting the facts relating to his complaint in the state prisoner grievance procedure. (D.I.7, part II B.). Undeniably, Plaintiff never grieved the prison officials' failure to provide his personal property to him upon his transfer to higher

security. The standard form Plaintiff used to file his complaint contains the question "Did you present the facts relating to your complaint in the state prisoner grievance Procedure?" (D.I.7, part II B.) Plaintiff marked the box "No." Plaintiff goes on to explain why he did not file a grievance by stating he, "was transferred to another prison before I could file a grievance, but did complain to Warden." Id, part D. Plaintiff attaches two letters addressed to Warden Bianca dated September 12, 2002 and September 22, 2002, purportedly sent requesting his personal property. (D.I.2, part IV, Statement of Claim, Exhs. C&D.). He also claims that he wrote to Commissioner Taylor after he did not receive a response to his letters. Id. Essentially, Plaintiff contends that filing a grievance would have been futile. However, Plaintiff's subjective belief concerning the futility of filing a grievance does not excuse the exhaustion requirements under the PLRA. See *Nyhuis v. Reno*, 204 F.3d at 71. "The PLRA requires an inmate to exhaust all administrative remedies prior to bringing a federal action challenging prison conditions, whether or not they provide the relief the inmate says he or she desires in the federal action." *Id.* Moreover, there is no dispute that Plaintiff was familiar with the inmate grievance procedures.

11.     Notwithstanding an emergency procedure is available to expedite the inmate grievance process in matters concerning substantial risks to inmate personal or psychological safety, Plaintiff never utilized that inmate grievance procedure to assert his claims that (1) he wants monetary compensation for the loss of his personal property, including his Quran and Kufi, and (2) his religious freedoms were infringed as a result of a Department inmate transfer and personal property regulation after he arrived at DCC.

12.     Nonetheless, Plaintiff is subject to the administrative exhaustion requirements

mandated by § 1997e (a). Thus this Court cannot permit Plaintiff's action to proceed in the face of Plaintiff's clear statement in his complaint that he did not file a grievance, even though the grievance process provided a three-step procedure or an emergency procedure. Moreover, there is no dispute that Plaintiff was familiar with the inmate grievance procedures.

13. In the instant case, Plaintiff cannot show that he exhausted available administrative remedies with regard to his allegations affecting his ability to exercise his religious freedoms. The Plaintiff did not file, as required at the institutional level, a grievance which described any restriction of his religious freedoms after the transfer to DCC on August 30, 2002, or anytime thereafter. Consequently, Plaintiff cannot offer genuine evidence to demonstrate that he exhausted available remedies prior to filing this action.

14. Indeed, this action is subject to the exhaustion requirements set forth in §1997e (a) which states in pertinent part:

> No action will be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997 e (a).

As the Third Circuit held in *Nyhuis v. Reno*, "the PLRA amended 1997e (a) in such a way as to make exhaustion of all administrative remedies mandatory - whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action." Id. 204 F.3d at 73.

15. Moreover, Plaintiff's failure to exhaust any administrative remedies available to him bars his federal lawsuit. *See Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004). For nearly

two years, Plaintiff did not take any action with regard to the property claims and the alleged infringement of his exercise of his religious freedoms.

16. The inmate grievance procedure permits "all inmates, regardless of physical condition/ security status/ administrative status, shall be entitled to use the IGP." Exhibit B. However, the IGP process "begins when an inmate files form #584. The grievant must complete this form within 7 calendar days following the incident and forward to the IGC." Exhibit B, IGP Resolution Levels.

17. Importantly, a careful review of the inmate grievance records maintained at the DCC reveals one grievance form filed by Plaintiff regarding an issue of religion. See Grievance Form dated 10-10-03 attached hereto as Exhibit C. It appears, that grievance involved a dispute with the area Sergeant and inmate-Plaintiff regarding whether the Chapel called for inmate's attendance on a specific day and time. See Exhibit C. Notwithstanding Plaintiff filed a grievance on October 10, 2003, relating to a specific, yet unrelated, incident occurring more than a year after the claims in this action, he does not include any claims that these defendants denied him access to religious resources, services, instruction or counseling or they denied him an opportunity to pursue his religious beliefs based on an institutional policy or regulation.

18. Clearly, given that Plaintiff did not pursue his claims in accordance with the grievance procedures he cannot now bring a federal action because he failed to exhaust his administrative remedies. *See, Spruill*, 372 F.3d at 230. Plaintiff's complaint should be dismissed as he cannot show that he has satisfied the requirements for the exhaustion of administrative remedies.

**D.    DEFENDANTS DID NOT DEPRIVE PLAINTIFF OF HIS FIRST AMENDMENT RIGHT TO EXERCISE HIS RELIGION.**

19.     The First Amendment requires prison officials to provide inmates a reasonable opportunity to practice their religious beliefs. *See Williams v. Sweeney*, 882 F.Supp. 1520, 1523 (E.D.Pa.1995) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342(1987)). In order to state a claim that Plaintiff's desire to practice his religion was unlawfully restricted by prison officials, he must show that a prison rule, regulation, or practice was not reasonably related to legitimate penological interests. *O'Lone,* 482 U.S. at 342. Plaintiff contends that because he is a Muslim practicing the Islamic faith, prison officials should have permitted him to take his Quran and Kufi with him as he was transferred between prison facilities. (D.I. 2).

20.     The United States Supreme Court has held that a prison regulation is valid if it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  The Court in *Turner*, assessing overall reasonableness of prison regulations, identified four factors courts could use for guidance on how to apply this standard: (1) whether there is a valid, rational connection between the prison regulation and a neutral and legitimate governmental interest; (2) whether there are alternative means of exercising the right in question; (3) the impact that accommodation of the asserted constitutional right would have on the guards and other inmates; and (4) whether there are adequate alternatives to meet the prison's objectives.  *See Id.* at 89-91.

21.     DOC mandates strict policies and procedures to ensure order and security for its employee and inmate population. See <u>Affidavit of Robert May</u> at Exhibit A. The policy relating to personal property is designed to maintain order and security by prohibiting the physical transfer of items during transport of inmates to higher security. <u>Id.</u> This policy is necessary to prevent an inmate from bringing drugs, weapons and other contraband into

the facility, and ensures the safety and security of the facility, DOC staff and other inmates. The Policy is a legitimate and neutral procedure. Moreover, the policy also reduces the impact such property transfers will have on the inmate intake process and housing assignments at receiving institutions. The undue burden to manage undetermined quantities of inmates' personal property is diminished.

22.     In the instant case, on August 29, 2002, prison officials apprehended Plaintiff after he escaped from the custody of the Morris Community Correction Center. See Affidavit of Robert May. Plaintiff's parole violation status warranted his transfer to higher security. Id. As a result, Plaintiff was transferred to DCC by the 2300 hrs-0700 hrs shift. Id. The MCCC orientation manual clearly states that "when offenders are returned to higher security they have 7 days to have their personal property picked up." Exhibit A. Otherwise, Offenders personal property not picked would be donated or disposed. Id. Plaintiff, in fact, signed such a form. Id. Lieutenant May reminded Plaintiff to have his property picked up within the required timeframe. Id. On September 5, 2002, Plaintiff authorized an individual named Alfrednette Johnson to pick up his paycheck. Id. Plaintiff failed to designate any other property to be picked up. Id.

23.     Plaintiff is not prohibited from practicing his religion while in DOC custody. Plaintiff, like all inmates within the Delaware prison systems, is granted wide latitude in practicing his religious faith. There is no dispute that Plaintiff has alternative means to exercise his religious freedoms. See *O'Lone v. Estate of Shabazz*, 482 U.S. at 352. Plaintiff is permitted to attend religious services and participate in religious programs. His grievance form indicates that he has been attending chapel services, and except the matter he grieved, he can continue to participate in religious services.

E.   **OFFICIAL CAPACITY AND SOVEREIGN IMMUNITY**

24.   The Eleventh Amendment provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." While the Amendment does not facially bar suits against the State by its citizens, the United States Supreme Court has held that in the absence of consent, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).

25.   The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive the states' immunity will produce this result. *Id*. No such clear intent can be seen in 42 U.S.C. §1983. In fact, Congress' intent appears to be to the contrary as the statute facially allows suits only to be brought against "persons." 42 U.S.C. §1983.

26.   A suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Under federal law, the Defendants in their official capacity are not "persons" for the purposes of 42 U.S.C. §1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Consequently, given this categorization, this Court lacks jurisdiction over the Defendants in their official capacity as the Defendants are outside the class of persons subject to liability under 42 U.S.C. § 1983. Therefore, Commissioner Taylor, Warden Bianca,

Lieutenant May, and Corporal Rygiel are immune from liability in this case and dismissal is appropriate.

27. Generally, government officials are protected from civil liability insofar as their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is designed to protect officials from the personal cost of litigation and the attendant inhibiting effect litigation has on the proper discharge of their official responsibilities. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Liability for allegedly unlawful actions rests on the "objective reasonableness" of the action "assessed in light of the legal rules that were clearly established at the time action was taken." *See Id.* at 640. In a more particularized sense, Prison Officials must have known that restricting the transfer of a prisoner's personal property after an escape violated the First Amendment. Clearly, Defendants could not have known that their policy violated Plaintiff's rights.

28. As the Third Circuit Court of Appeals held in *Ryan v. Burlington County*, 889 F.2d 1286, 1292 (3d Cir. 1989) "[t]he defense of qualified immunity is a recognition of the fact that subjecting public officials to personal liability for their discretionary actions results in the distraction of those officials from their public duties, inhibits their discretionary actions and, quite possibly, deters qualified people from accepting public service." *Id*. Instantly, even if the Defendants are found to have violated the Plaintiff's constitutional rights, they are immune from personal liability because a reasonably well-trained correctional official would not know that the actions they took violated Plaintiff's constitutionally protected interest, nor would they realize that their actions were other

than rationally related to furthering the legitimate penological interests of maintaining security, order and discipline.  As well, Defendants are entitled to qualified immunity because they acted in good faith, without gross or wanton negligence, in their performance of their discretionary duties.  *Vick v. Haller*, 512 A.2d 249 (Del. Super.1986), *aff'd in part and rev'd in part on procedural grounds*, 514 A. 2d 782 (Del. 1986). As Plaintiff fails to defeat the defense of qualified immunity, dismissal is appropriate.

WHEREFORE, for the foregoing reasons, Defendants respectfully request that their Motion to Dismiss be granted, and Defendants be granted judgment in their favor.

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

/s/ Ophelia M. Waters
Ophelia M. Waters
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302) 577-8400
Dated: September 12, 2005          ophelia.waters@state.de.us

**CERTIFICATE OF SERVICE**

       I hereby certify that on September 12, 2005, I electronically filed *State Defendants' Memorandum of Law* with the Clerk of Court using CM/ECF. I hereby certify that on September 12, 2005, I have mailed by United States Postal Service, the document to the following non-registered participant: Ernest A. Crump, Jr.; SBI #149221; Delaware Correctional Center; 1181 Paddock Road; Smyrna, DE 19977.

       **STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

/s/ Ophelia M. Waters
Ophelia M. Waters
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302)577-8400
ophelia.waters@state.de.us